**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

| | |
|---|---|
| TIFFINE HANSBROUGH and SHAWN KIRCHNER, individually and on behalf of all others similarly situated, | Case No.: 5:24-cv-05214-TLB |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| vs. | |
| WALMART INC., | JURY TRIAL DEMANDED |
| Defendant. | |

Plaintiffs Tiffine Hansbrough and Shawn Kirchner, individually and on behalf of all others similarly situated, by and through their attorneys, file this Class Action Complaint against Defendant Walmart Inc. ("Walmart" or "Defendant"). The following allegations are based on personal knowledge as to Plaintiffs' own conduct and the investigation conducted by their counsel, on documents publicly available through Walmart and/or about Walmart and the products at issue, and upon information and belief.

## SUMMARY OF THE ACTION

1.      Plaintiffs bring this consumer class action individually and on behalf of classes of similarly situated owners of touchscreen tablet computers that Defendant marketed, sold, and distributed to customers and retailers across the country under its private label brand "Onn" (stylized by Defendant as "onn.")

2.      This action arises from Defendant's concealment of a material defect in the 2019, 2020, 2021, and 2022 Onn Surf and Pro tablets (the "Class Devices"). The displays of the Class Devices—which are necessary for their operation—are prone to cracking, developing black patches of "dead pixels," and otherwise ceasing to function as the result of the Class Devices' defective design and materials (the "Display Defect").

3.      Plaintiffs Hansbrough and Kirchner are residents of California and Massachusetts, respectively, and bring this case individually and on behalf of similarly situated persons in California and Massachusetts who purchased Class Devices.

4.      Applying normal pressure to the screen of a Class Device during ordinary use, or subjecting a Class Device to ordinary and foreseeable stress (such as allowing it to gently drop to a surface or placing it into or removing it from a protective case), can cause the screen to crack,

malfunction, or cease to function. The Display Defect typically renders the Class Devices unusable, usually within the warranty period.

5.    Walmart has long been aware of the Display Defect in the Class Devices. Yet, notwithstanding its longstanding knowledge of the Display Defect, Defendant routinely has refused to repair or replace the Class Devices without charge or issue a refund when the Display Defect manifests and renders a device unusable.

6.    Many owners of the Class Devices have communicated with Walmart's employees and agents to request that Defendant remedy and/or address the Display Defect and/or resultant damage at no expense. Defendant has failed and/or refused to do so.

7.    Moreover, Walmart has not taken sufficient action to warn consumers about the Display Defect. Defendant has not publicly acknowledged the Display Defect in any forum.

8.    Plaintiffs and class members would not have been able to learn of the Display Defect before their purchases, even with the exercise of reasonable diligence, as evidence of the Display Defect—i.e., pre-release testing data and warranty and return data—was wholly within the possession and control of Defendant.

9.    As a result of Walmart's unfair, deceptive, and fraudulent business practices, owners of the Class Devices, including Plaintiffs, have suffered an ascertainable loss of money, property and/or value. The egregiously unfair, deceptive, and unconscionable trade practices committed by Defendant give rise to substantial aggravating factors.

10.    Had Plaintiffs and class members known about the Display Defect at the time of purchase, they would not have bought the Class Devices, or would have paid substantially less for them.

11.     As a result of the Display Defect and the monetary costs associated with attempting to repair damage caused by the Display Defect and replacing the Class Devices, Plaintiffs and class members have suffered injury in fact, incurred damages, and otherwise have been harmed by Defendant's conduct.

12.     Plaintiffs bring this action to redress the Display Defect under California and Massachusetts consumer protection statutes, including state laws claims for breach of implied and express warranties, fraudulent misrepresentation, and unjust enrichment. Plaintiffs seek money damages and equitable relief for Defendant's conduct described herein.

## PARTIES

### A. Plaintiffs

13.     Plaintiff Tiffine Hansbrough is a resident of California.

14.     Plaintiff Shawn Kirchner is a resident of Massachusetts.

### B. Defendant

15.     Defendant Walmart is a corporation formed under the laws of the State of Delaware with its headquarters in Bentonville, Arkansas.

16.     Walmart operates nationwide, with approximately 48 stores in Massachusetts and over 300 stores in California.

17.     Defendant is primarily in the business of retail-variety stores. America's largest retailer by sales, Walmart operates over 11,500 stores under 56 banners, selling a variety of general merchandise and grocery items.

18.     Walmart sells products through dozens of private label brands, *i.e.*, goods that are manufactured by a third party, but packaged and sold by Defendant under one of Walmart's private labels.

19.     Walmart's profit margins on private labels are higher than they are for well-known national brands, with aggregate figures suggesting private label sales generate around twice as much margin for a retailer as sales of national brands.[1] Walmart controls many or all aspects of the design and manufacture of their private label products.[2]

20.     Walmart exerts substantial control over the design and manufacturing of its private labels, including Onn, and conducts quality control checks directly or through its agents.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interest and costs. This is a putative class action in which more than two-thirds of the proposed class members are citizens of states other than the state in which Defendant is deemed to reside. In addition, this Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Walmart because its principal place of business and headquarters are located in this District.

23.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PLAINTIFF SPECIFIC ALLEGATIONS

A.  **Plaintiff Tiffine Hansbrough**

---

[1] James Brumley, *Walmart's Private-Label Brands Are Its New Edge*, Fool.com (Oct. 8, 2021), *available at* https://www.fool.com/investing/2021/10/08/walmarts-private-label-brands-are-its-new-edge/ (*last accessed* July 2, 2022).
[2] Brian Connolly, *2022 Guide to Walmart Private Label*, JungleScout.com (April 12, 2022), *available at* https://www.junglescout.com/blog/walmart-private-label-brands/ (*last accessed* July 2, 2022).

24.     In 2023, Plaintiff Hansbrough purchased a 10.1" Onn Surf Tablet from a Wal-Mart in Riverside, CA for her young child.

25.     In purchasing the tablets, Plaintiff Hansbrough relied on the tablet's packaging, which included representations as to the product's durability and appropriateness for children's use. These representations included the packaging's marketing that the product was a "Kids' Tablet" designed "just for them" and "made [to be] more kid-centric," had a "scratch-resistant touchscreen," came with a "[s]ilicone case." A picture of the packaging Plaintiff Hansbrough's tablet came in is provided below.



26.     The fact that Defendant advertised and warranted the Class Devices as durable and suitable for children was material to Plaintiff Hansbrough and to other reasonable consumers.

27.     Within a month of purchase, the tablet purchased by Plaintiff Hansbrough cracked in the course of regular and ordinary use by her child, rendering the tablet unusable. A picture of Plaintiff Hansbrough's cracked tablet is provided below.



28.     Plaintiff Hansbrough attempted to return the cracked tablet in person at the Wal-Mart where she made her purchase, but her attempts were unsuccessful. She was also unable to obtain a refund of her purchase.

29.     Ms. Hansbrough and her child used and maintained the tablets in a manner typical of a reasonable consumer.

B. **Plaintiff Shawn Kirchner**

30.    In October and November 2022, Plaintiff Kirchner purchased multiple 8" Onn Surf Tablet Pro devices for his young children from a Wal-Mart store in Pittsfield, MA.

31.    Plaintiff Kirchner relied on the tablet's packaging to make his purchase, which included representations as to the product's durability and appropriateness for children's use. These representations included the packaging's marketing that the product was a "Kids' Tablet" designed "just for them" and "made [to be] more kid-centric," had a "scratch-resistant touchscreen," came with a "[s]ilicone case." A picture of the packaging Plaintiff Kirchner's tablet came in is provided below.



32.    The fact that Defendant advertised and warranted the Class Devices as durable and suitable for children was material to Plaintiff Kirchner and to other reasonable consumers.

7

33.    Within a month of purchase, the tablets purchased by Plaintiff Kirchner cracked in the course of regular and ordinary use by his children, rendering the tablet unusable. A picture of one of Plaintiff Kirchner's cracked tablets is provided below.



34.    While Plaintiff Kirchner was able to initially exchange cracked tablets for replacements through the Pittsfield Wal-Mart, the replacement tablets also experienced screen cracking issues, rendering them unusable.

35.    Plaintiff Kirchner was ultimately unable to return the cracked tablets, and was not able to obtain a refund of his purchase.

36.    Plaintiff Kirchner and his children used and maintained the tablets in a manner typical of a reasonable consumer.

## COMMON FACTUAL ALLEGATIONS

### A.    Background

37.    The tablet market in the United States is the largest globally, accounting for around one-third of all annual tablet unit shipments worldwide. The U.S. tablet market size was valued at USD 18 billion in 2016,[3] and has since grown to 19.21 billion in 2021, with over 58 million tablets sold nationwide.[4]

38.    The display is a critical piece of hardware in a tablet as it is the primary interface through which a user interacts with the device. There is intense competition in the smart tablet market over display quality and size.[5]

39.    Like most tablet computers, the Class Devices use capacitive touchscreen technology to allow a user to interact with the device through the screen. In nearly all portable touchscreen device applications:

> Capacitive screens are made up of multiple layers of glass and plastic, coated with a conductor material like indium tin oxide or copper. This conductive material responds when contacted by another electrical conductor, like your bare finger. When you touch your screen, an electric circuit is completed at the point where your finger makes contact, changing the electrical charge at this location. Your device registers this information as a "touch event."

---

[3] *U.S. Tablet Market Size, Share & Trends Analysis Report By Operating System Type (Android, iOS), Competitive Landscape, And Segment Forecasts, 2018 – 2025*, Grandviewresearch.com, *available at* https://www.grandviewresearch.com/industry-analysis/us-tablet-market (*last accessed* July 2, 2022).

[4] Thomas Alsop, *Tablet market in the U.S. - Statistics & Facts*, Statista.com (Feb. 9, 2022), *available at* https://www.statista.com/topics/2927/tablets-in-the-us/#dossierKeyfigures (*last accessed* July 2, 2022).

[5] *See, e.g.,* Robert Triggs, *The Best of Android: Mid-2020 — Which tablet has the best display?,* AndroidAuthority.com (Jul. 13, 2020), *available at* https://www.androidauthority.com/best-of-android-mid-2020-display-1135186/ (*last accessed* July 2, 2022).

> Once a touch event has been registered, the screen's receptors signal
> this event to the operating system, prompting a response from your
> device. This is the application's interface that you experience.[6]

40.    In nearly all portable touchscreen device applications, the outermost layer of the

screen is protective glass coated with a conductive material. Under that is the "digitizer," a layer

of coated glass or polymer that senses analog touch inputs and converts them into digital signals.

Under the digitizer is the display layer, typically a liquid crystal display ("LCD"). The digitizer

connects to the LCD using a flex cable, and the flex cable transmits the converted digital signals

to the LCD.[7]

41.    LCDs are comprised of tiny elements of color called pixels. LCDs produce images

by illuminating these pixels with either red, green, or blue light. Most LCDs use a grid of wires to

power the layer of pixels.

42.    A digitizer will lose some or all of its function if it is physically damaged or its

connection to the other hardware is disconnected or damaged. A damaged digitizer may not

accurately detect touch events, meaning the touchscreen may fail to respond to user interaction

appropriately or become completely inoperable.[8] Likewise, damage to the LCD, specifically to the

grid of wires powering the pixels, can cause pixels to lose power and "die." Sufficient damage will

result in groupings of dead pixels that form black spot(s) on the display.

## B.    The Onn Surf Tablets

---

[6] Sophie Sirois, *How Do Touch Screens Work on Laptops and Tablets?*, HP.com (Dec. 12, 2018), *available at*
https://www.hp.com/us-en/shop/tech-takes/how-do-touch-screens-work#:~:text=Capacitive%20screens%20are%20made%20up,conductor%2C%20like%20your%20bare%20finger (*last accessed* July 2, 2022).
[7] *What Is a Touchscreen Digitizer?*, Nelson-miller.com (Sep. 11, 2019), *available at*
https://nelson-miller.com/what-is-a-touchscreen-digitizer/#:~:text=In%20touchscreen%20devices%2C%20the%20digitizer,crystal%20display%20(LCD)%20layer (*last accessed* July 2, 2022).
[8] *Id.*

43.     First announced on March 13, 2019, and made available for purchase on or around May 22, 2019, Walmart began selling two sizes of the Class Devices: the 10.1" and 8" models, which retailed for $79 and $64, respectively. Aside from their display size, both devices were equivalent in all relevant respects.[9] Walmart subsequently introduced a 7" model of the Class Devices, which retailed for $59.

44.     Although Defendant has updated certain cosmetic features of all three of these models and increased their prices since the launch of the original Class Devices, the hardware of subsequent Class Devices is equivalent in all respects relevant to this action. As discussed in more detail below, all of the Class Devices use screens fashioned from the same inappropriate materials.

45.     Walmart marketed, sold, and distributed the Class Devices to customers and retailers across the country under its private label brand "Onn."

46.     The Class Devices were manufactured by LightComm Technology Co., LTD ("Lightcomm"), a Chinese manufacturing company.

47.     In this capacity, Lightcomm served as Walmart's agent. Defendant controlled and directed Lightcomm in the manufacture of the Class Devices. This is evidenced by the fact that Lightcomm is a private label supplier to Defendant and as such is subject to numerous compliance obligations concerning the Class Devices.

48.     Defendant requires its suppliers, like Lightcomm, to undergo regular audits and inspections. Before initiating a business relationship, Defendant requires each supplier to enter into a Supplier Agreement and undergo at least three "Pre-Qualification Audits" conducted by Walmart's designated auditors, including a Factory Capability & Capacity Audit, a Responsible

---

[9] Simon Hill, *Walmart Onn Android Tablet Review*, Digitaltrends.com (Oct. 7, 2019), *available at* https://www.digitaltrends.com/mobile/walmart-onn-review/ (*last accessed* July 2, 2022).

Sourcing Audit, and a Supply Chain Security Audit.[10] Defendant also audits and inspects its suppliers on an ongoing basis. The "Private Brands" page on Defendant's Chinese website explains that "All manufacturers of our private branded products are tested for safety and audited regularly to ensure consistent standards of quality. Walmart selects our manufacturing partners carefully and works with them directly to secure lower prices compared to similar products in the market."[11] Elsewhere, Defendant explains that "Doing business with Walmart requires making your products, facilities, and records available for audits, inspections, and tests. You must obtain required audits, inspections, and tests in accordance with Walmart policy and provide the results to Walmart, collaborating with Walmart to resolve any issues."[12]

49.     Additionally, suppliers must comply with a multitude of other ongoing obligations imposed by the Supplier Agreement. In the Standards for Suppliers manual, Defendant's CEO, Doug McMillon, states "We hold our suppliers to the same high standards we set for ourselves."[13] Among other things, Walmart "require[s] our suppliers to meet all laws, mandatory standards,

---

[10] *Supplier Requirements*, Walmart.com, *available at*
https://corporate.walmart.com/suppliers/requirements (*last accessed* Dec. 20, 2022).
[11] *Private Brands*, Walmart.cn, *available at* https://en.walmart.cn/private-1/ (*last accessed* Dec. 20, 2022).
[12] *Audits, Certifications and Testing*, Walmart.com, *available at*
https://corporate.walmart.com/suppliers/requirements/audits-and-certifications (*last accessed* Dec. 20, 2022).
[13] *Standards for Suppliers (Product Suppliers)* at 3, Walmart.com, *available at*
https://corporate.walmart.com/media-library/document/standards-for-suppliers-english/_proxyDocument?id=0000015c-e70f-d3b4-a57e-ff4f3f510000https://en.walmart.cn/private-1/
(*last accessed* Dec. 20, 2022) (explaining that "The Standards apply to suppliers of Walmart Inc. and suppliers of Walmart-controlled subsidiaries globally. Suppliers include anyone that provides products to Walmart, including goods for resale and for Walmart's own use. A signed supplier agreement, acceptance of a purchase order, and/or provision of merchandise to Walmart constitutes acceptance of these Standards and serves as the Supplier's continuing affirmation of compliance. In addition, Walmart may enter into contracts with certain
other parties that require those parties to comply with these Standards. In this document, we refer to anyone covered by the Standards as a 'supplier.'").

applicable voluntary consensus standards, and Walmart-specific requirements for all items offered for sale," and "expect[s] you to meet our expectation of complying with consumer protection laws everywhere we do businesses [*sic*]."[14] Walmart makes clear that its business relationship with its suppliers is contingent upon compliance with Walmart's standards, and "Walmart reserves the right to audit or inspect suppliers at any time to determine whether they are complying with these Standards."[15] Defendant requires its suppliers to "Uphold High Standards for Safety and Quality" by, *inter alia*, "Monitoring products you produce for safety and quality and promptly reporting material issues to Walmart."[16]

50.    Walmart sold the Class Devices through its physical locations and website and distributed the Class Devices to be sold through other authorized retailers as well, primarily Amazon.com. Many Class Device owners purchased their tablets through Amazon.com.

51.    Walmart and authorized retailers sold Class Devices to tens of thousands of consumers throughout the United States, including in the Plaintiffs' respective home states. Walmart disseminated marketing materials for the Class Devices from its Arkansas headquarters.

52.    Defendant marketed, promoted, and advertised the Class Devices as, among other things, the "dependable, versatile range of tablets for every household" with a heavy focus on their screen quality.

---

[14] *Supplier Expectations Compliance Areas*, Walmart.com, *available at* https://corporate.walmart.com/suppliers/requirements/compliance-areas#product-safety (*last accessed* Dec. 20, 2022).

[15] *Standards for Suppliers (Product Suppliers)* at 5, Walmart.com, *available at* https://corporate.walmart.com/media-library/document/standards-for-suppliers-english/_proxyDocument?id=0000015c-e70f-d3b4-a57e-ff4f3f510000 https://en.walmart.cn/private-1/ (*last accessed* Dec. 20, 2022).

[16] *Id.* at 12.

53.     As Walmart's entry into the tablet market, the Class Devices are competing with a variety of tablets known for their large, high-quality screens. The display is critical to the function of the Class Devices: as they possess no more than three physical buttons,[17] the vast majority of user interactions are conducted by tapping, swiping, and touching the graphical interface shown on the device's display.

54.     Given the critical nature of the screen of a Class Device, any manifestation of the Display Defect materially reduces the usability and functionality of a Class Device. In most cases, the manifestation of the Display Defect renders a Class Device completely unusable immediately or within several days.

55.     Defendant consistently highlighted the size and high quality of the Class Devices' "crystal-clear display," claiming their "2.5D touchscreen gives you 800 x 1280 resolution so your photos, movies, apps, documents, and more pop with crystal clear vibrancy."[18] Defendant also touted the "stunning clarity" of the display.[19]

---

[17] *See Onn 10.1" Tablet 100003562 User Guide*, Manualsplus.com, *available at* https://manuals.plus/onn/10-1-tablet-100003562-manual#getting_to_know_your_tablet (*last accessed* July 2, 2022).

[18] *onn. 10.1" Tablet, 32GB (2020 Model)*, Walmart.com, *available at* https://www.walmart.com/ip/onn-10-1-Tablet-32GB-2020-Model/248528865?athbdg=L1600 (*last accessed* July 2, 2022); *see also onn. 8" Tablet, 16GB Storage*, Walmart.com (archived Oct. 4, 2019), *available at* https://web.archive.org/web/20191004055901mp_/https://www.walmart.com/ip/Onn-Android-Tablet-8-16GB-Storage-Bonus-20-off-Walmart-eBooks-Included/767511102 (*last accessed* July 2, 2022); *onn. 10.1" Tablet, 16 GB Android Tablet*, Walmart.com (archived Oct. 4, 2019), *available at* https://web.archive.org/web/20190914120712mp_/https://www.walmart.com/ip/Onn-10-1-16-GB-Android-Tablet-Bonus-20-off-Walmart-eBooks-Included/258891221 (*last accessed* July 2, 2022); *onn. 7" Tablet 16GB Android*, Walmart.com, *available at* https://www.walmart.com/ip/onn-7-Tablet-16GB-Android-Bonus-10-off-Walmart-eBooks-Included/337319622 (last accessed July 2, 2022).

[19] *onn. 8" Tablet Pro, 32GB (2020 Model)*, Walmart.com, *available at* https://www.walmart.com/ip/onn-8-Tablet-Pro-32GB-2020-Model/648267237 (*last accessed* July 2, 2022).

56.     Defendant uniformly marketed, promoted, and advertised all Class Devices as fully functioning tablets without defects, including but not limited to any faults in the display or any predisposition to suffer display-related issues, and as offering the same high-quality display.

57.     Defendant also marketed the Class Devices as suitable for children, encouraging consumers to "Enjoy the new Kids Mode for the younger ones,"[20] and Defendant representing that the Class Devices are "perfect for kids."[21]

58.     Plaintiffs and thousands of other consumers purchased the Class Devices based on Walmart's representations that they were dependable and versatile tablets offering broad functionality and durable enough to be suitable for children. Defendant's representations regarding the size and quality of the display were material selling points to Plaintiffs, who purchased the tablets to be used for, *inter alia*, watching movies, browsing the internet, playing video games, viewing photos, and other uses that benefit from a high-quality display. Defendant portrayed the Class Devices being used for each of these activities in its marketing.

59.     But Defendant failed to disclose the crucial fact that the Class Devices suffer from the Display Defect. The existence of the Display Defect renders Defendant's marketing false and misleading, in particular its claims with regard to the dependability and versatility of the Class Devices, as well as the quality of their displays.

60.     Defendant knew or should have known about the Display Defect before releasing the Class Devices. Despite this knowledge, Walmart marketed the Class Devices as high quality,

---

[20] *onn. 10.1″ Tablet, 32GB (2020 Model)*, Walmart.com, *available at* https://www.walmart.com/ip/onn-10-1-Tablet-32GB-2020-Model/248528865?athbdg=L1600 (*last accessed* July 2, 2022).
[21] *onn. 8″ Tablet Pro, 32GB (2020 Model)*, Walmart.com, *available at* https://www.walmart.com/ip/onn-8-Tablet-Pro-32GB-2020-Model/648267237 (*last accessed* July 2, 2022).

dependable, and versatile tablet computers, offering broad functionality. But the existence of the Display Defect ensures that many owners of Class Devices are in fact unable to "surf the internet, read email, watch movies, read eBooks, listen to music, play games, and take pictures and video" as promised by Defendant's marketing materials.[22]

## C. The Display Defect

61.    Numerous Class Device purchasers have found that their displays unexpectedly cracked or malfunctioned as the result of ordinary use of a Class Device, or as the result of ordinary stress upon their Class Device (such as allowing it to make a short drop to a surface). Not only do protective cases appear to offer little protection from damage arising from the Display Defect, but they are also often cited as the cause of the damage (*e.g.*, the display cracks when trying to insert or remove a Class Device from a screen protector). Damage arising from the Display Defect happens without warning and most often renders the tablets unusable.

62.    To assess the cause of this common and widespread occurrence, Plaintiffs' counsel consulted Dr. David Niebuhr of Niebuhr Metallurgical Engineering.  Dr. Niebuhr is a Professional Metallurgical Engineer and former Professor of Materials Engineering and current Adjunct Professor in Mechanical Engineering at California Polytechnic State University.  Dr. Niebuhr has devoted more than 25 years of his career to product development, materials selection, and design and failure analysis.

---

[22] *Onn Android Tablet, 8″, 16GB Storage*, Walmart.com (archived Oct. 4, 2019), *available at* https://web.archive.org/web/20191004055901mp_/https://www.walmart.com/ip/Onn-Android-Tablet-8-16GB-Storage-Bonus-20-off-Walmart-eBooks-Included/767511102 (*last accessed* July 2, 2022).

63.    Dr. Niebuhr compared the Class Devices to comparable portable tablet devices to determine what was different in the Class Devices and what was causing Plaintiffs' and Class members' displays to crack, blotch, or otherwise cease to function altogether.

64.    His evaluation of the Class Devices focused primarily on materials and structural design.  Based on Dr. Niebuhr's preliminary assessment, he determined that the Class Devices suffer from a defect that renders the display subject to cracking, blotching, and failure during regular use even by the most careful consumer.

65.    Specifically, Dr. Niebuhr attributes the source of the Display Defect to twin faults: the use of inappropriate materials for the touchscreen and case, and a flawed case design.

66.    Testing conducted by Dr. Niebuhr revealed that the touchscreen is made from poly(ethyl acrylate) ("PEA"). This polymer is cheaper than glass, which is far and away the most common touchscreen material, and cheaper than polymers that are commonly used in touchscreens, *e.g.*, polycarbonate (also used to make lenses for glasses) or poly(methyl methacrylate) (also known as plexiglass). PEA is also more susceptible to scratching and fracture than the more commonly used touchscreen materials. Extensive research was unable to find any examples of PEA being used for a touchscreen application. Compared with the standard choices for touchscreen construction, PEA possesses low impact resistance and tensile strength.

67.    The same testing found that the Class Device cases are made of polystyrene. This polymer is cheaper than polycarbonate, the polymer most commonly used to construct the cases of portable electronic devices.[23]  Although brittle when unadulterated, most commercial

---

[23] *See* Chin Trento, *What is the Material of Your Phone Body?*, Stanford Advanced Materials, *available at* https://www.samaterials.com/content/what-is-the-material-of-your-phone-body.html (*last accessed* July 2, 2022).

polystyrene contains additives that permit some flexibility—a feature that makes this polymer inappropriate for the Class Devices.

68.    The polystyrene case of the Class Devices lacks interior features that would prevent it from bending and twisting (for example, internal buttresses or ridges) when force is applied to the device. The touchscreen, which, due to the properties of PEA, is brittle and prone to fracture, needs a rigid case to protect it. In the absence of a rigid case, even slight bending or twisting of a Class Device can cause the touchscreen to crack.

69.    Given the design defect, the Class Device displays are not strong enough to endure the stresses they experience in the course of normal and foreseeable use.

70.    As a secondary effect of Defendant's inappropriate material choices and case design, the Class Device touchscreens are prone to black blotching and complete failure. Black discoloration on the touchscreens is caused by dead pixels, which result from physical damage to the touchscreen, specifically the underlying LCD. Similarly, physical damage to the display can cause the digitizer to stop registering touch or to fail completely. Cracks in the display not only compromise the touchscreen function, but also render the display more susceptible to failure caused by dust, moisture, and skin oil entering the device, which can lead to display failure and other damage, including safety hazards (as discussed below).

71.    Because the Class Device touchscreens are extremely susceptible to physical damage arising from ordinary use, a large percentage of Class Devices experience screen blotching, touch failure, or dead screens.

72.    Below are photos of manifestations of the Display Defect.



*Figure 1 A Class Device with a fractured display*



*Figure 2 Close shot of a Class Device's fractured display*

73.    The Display Defect can manifest inside or outside of the return and warranty periods, but it typically causes damage before the 1-year warranty period is over. In some tablets the Display Defect manifests within the first days of use; in other cases the Display Defect may become apparent only after months of use.

74.    The Display Defect is latent in nature because it is not obvious or ascertainable upon reasonable examination. Further, as described herein, Walmart did not disclose the Display Defect in any marketing materials or elsewhere.

75.    The Display Defect renders much of Defendant's express representations misleading. For example, the Class Devices are not durable enough for children to use. Nor are

the Class Devices "dependable" or "versatile": any manifestation of the Display Defect renders the device unsuitable for nearly all uses, and in many cases renders the devices completely inoperable (*e.g.*, the display may fail or the user may not be able to log in due to the touchscreen not responding to user input). A defective display that is cracked is not "crystal-clear" and cannot display "photos, movies, apps, documents, and more . . . with crystal clear vibrancy."[24]

76.     Moreover, the Display Defect poses a safety concern to Class Device owners who try to continue using their devices after the manifestation of the Display Defect. A cracked display on a smart device poses a multitude of dangers, including the risk of electric shock due to contact with the electrical layers underneath the display and increased risk of fire due to interference with the device's electrical systems leading to a short circuit.[25] The risk of fire increases with the severity of the cracking and the length of time the device is in use after the cracking appears, as dust and liquid work their way into the device.

77.     The Display Defect poses other risks to the health and safety of users as well. The sharp edges of a crack can easily slice open a finger as it slides across the display, and severe cracks can result in splinters that pierce the skin during use or separate from the screen and risk injuring the user when they come into contact with them. Additionally, visual obstructions resulting impede the user's ability to easily view the display and lead to eye strain and consequent diminished vision, headaches, and other symptoms.[26]

**D.  Defendant's Knowledge of the Display Defect**

---

[24] *onn. 10.1″ Tablet, 32GB (2020 Model)*, Walmart.com, *available at* https://www.walmart.com/ip/onn-10-1-Tablet-32GB-2020-Model/248528865?athbdg=L1600 (*last accessed* July 2, 2022).
[25] *How Dangerous Is A Cracked Phone Screen?*, SupportWise.co.uk (Feb. 6, 2023), available at https://supportwise.co.uk/how-dangerous-is-a-cracked-phone-screen/ (*last accessed* July 2, 2022) ("To answer the title: *very*.")
[26] *See id.*

78.    Defendant owed Plaintiffs and all those similarly situated a duty to disclose the Display Defect. At the earliest, Defendant knew that the Class Devices were susceptible to display problems before they were released to the market. Alternatively, Defendant knew of the Display Defect no later than late 2019 from customer feedback—in the form of warranty claims, return attempts, and customer reviews to Walmart.com—making clear that the displays were prone to cracking. Defendant did not, however, disclose this information to consumers who were making their purchasing decisions. A reasonable consumer would assume that a tablet marketed as a "dependable, versatile" device possessing a "crystal-clear display"—and marketed specifically as suitable for children—would possess a display that is not susceptible to catastrophic failure caused by ordinary use.

79.    Plaintiffs and those similarly situated did not, and could not, unravel Defendant's pattern of deception and public silence.

80.    Walmart knew or should have known about the Display Defect prior to releasing the first models of Class Devices due to quality controls and pre-release testing process.

81.    Like any consumer electronics manufacturer, Defendant or its agents test its products prior to release. Defendant or its agents built prototypes of the Class Devices and conducted extensive validation testing during the pre-production phase of the development of the Class Devices. The purpose of such testing is to expose any design or manufacturing weaknesses that may result in field failures, warranty claims, and general functional reliability over the intended life of their products.

82.    Validation testing covers all system aspects of the device, including mechanical and system reliability, as well as safety, compliance to applicable standards, electromagnetic emissions, energy efficiency & sustainability.  Mechanical and system reliability tests are designed

and used to demonstrate that a design and the finished product perform reliably for the life of the product.

83.    As discussed above, Defendant regularly audits its private label product suppliers "to ensure consistent standards of quality."[27] "Walmart reserves the right to audit or inspect suppliers at any time to determine whether they are complying with" Defendant's rigorous set of supplier standards.[28] These audits include quality control and validation product testing. Defendant also requires its suppliers to "Uphold High Standards for Safety and Quality" by, *inter alia*, "Monitoring products you produce for safety and quality and promptly reporting material issues to Walmart."[29]

84.    Thus, Defendant's pre-release testing would have revealed the Display Defect. Because the damage arising from the Display Defect commonly manifests during normal use, happens suddenly, and is obvious, even negligible testing would have revealed that the Class Devices suffer from the Display Defect.

85.    After releasing the Class Devices, in connection with marketing, selling, and distributing the Class Devices, Defendant knew or should have known about the Display Defect due to post-release failure analyses, internet reviews, consumer complaints, warranty claim data, return data, and replacement part sales data.

86.    Though Walmart's warranty and return data is not publicly accessible, it is apparent that a significant percentage of Class Device owners have sought to return their devices both within

---

[27] *Private Brands*, Walmart.cn, *available at* https://en.walmart.cn/private-1/ (*last accessed* Dec. 20, 2022).

[28] *Standards for Suppliers (Product Suppliers)* at 5, Walmart.com, *available at* https://corporate.walmart.com/media-library/document/standards-for-suppliers-english/_proxyDocument?id=0000015c-e70f-d3b4-a57e-ff4f3f510000 https://en.walmart.cn/private-1/ (*last accessed* Dec. 20, 2022)

[29] *Id.* at 12.

and outside of the warranty period because of the Display Defect. Thus, Defendant would have been made aware of the Display Defect due to the large number of returns and/or warranty claims made during the Class Devices' warranty period.

87.     Defendant also monitors the internet for articles, comments, and posts made about the Display Defect. At a minimum, Defendant reviews the reviews posted to its own website for problems with its merchandise.

88.     Online reputation management ("ORM") is now a standard business practice among most major companies, including Defendant, and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on consumer services.   "Specifically, [ORM] involves the monitoring of the reputation of an individual or brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before the damage to the individual's or brand's reputation."[30]

89.     Soon after Walmart began selling the Class Devices, customers began posting complaints about their displays to Walmart's website. It rapidly became obvious that the Display Defect is a serious problem for the Class Devices.

90.     A multitude of owners of Class Devices have complained about the impact of the Display Defect in reviews of the tablets, primarily on Walmart's own website. Below is a sample of relevant reviews posted to the Class Devices' product pages on Walmart.com:

---

[30] *Online Reputation*, WebSolutions*, available at* https://websolutions-maine.com/online-reputation/ (*last accessed* Oct. 20, 2022).

- *Review by Jessica on Jun. 25, 2019*: **CRAP!** Worst purchase ever! One day and the screen is cracked and tablet will not work! Crap in a box! Do not buy![31]

- *Review by Monisha on Nov. 4, 2020*: **Don't buy!** One simple crack will stop the screen from working. Went through 2 of these tablets in less than 2 weeks. The second time I had a screen protector and the screen on the table cracked and the protector was still perfect. [32]

- *Review by Kari on Apr. 14, 2021*: **Cheaper means cheaply made**
  The tablet seemed to be functioning fine however I bought the corresponding screen protector and case for it. It will not charge with the case on it. About two weeks after purchase while removing the case the screen cracked. I had removed the case to charge it several times before without an issue. I was not using excessive force. I bought a tablet for my daughter as well and she cracked her screen within a month.[33]

- *Review by Audreysfn on Jan. 10, 2021*: **Don't bother**
  We got this for our 9yo for Xmas. It was broken within 5 days. I've never seen such a cheap, flimsy tablet. While it worked it did work well. The system ran well and all of his games and videos worked perfectly. Sadly, the screen is extremely delicate and with just a small ding (I saw it happen[34]

- *Review by Cassandra on Aug. 13, 2021*: **Not Worth It!**
  This is ridiculous! I have bought three of these tablets and they have cracked in the same place every single time. They have always had a screen protector and a case on them. Weren't dropped, were used carefully, and still every single one of them cracked the screen![35]

- *Review by Kaylee on Apr. 18, 2021*: **Don't waste your money.**
  This tablet sucks. I got it twice. Once by delivery, it was shattered when I opened the box. Got a refund for that one because they were "out of stock" but they had some at the store

---

[31] *onn. 8″ Tablet 16GB*, Walmart.com, *available at*
https://www.walmart.com/reviews/product/337319622?filter=1&page=5 (*last accessed* July 2, 2022).
[32] *Id.*
[33] *onn. 8″ Tablet, 32GB (2020 Model)*, Walmart.com, *available at*
https://www.walmart.com/reviews/product/432705729?filter=1 (last accessed July 2, 2022).
[34] *Id.*
[35] *Id.*

so we just bought another one there. It had a glass screen protector AND a durable case with another screen protector attachment. My son got ahold of it and dropped it over our baby gate (about 3 feet) and the screen itself got one small crack in it, and the screen does not work at all anymore. These tablets are garbage. Don't waste your money.[36]

- *Review by Tameka on Apr. 1, 2021*: screen black out and stop working[37]

- *Review by Elizabeth on Jul. 6, 2020*: I bought two for my kids put screen protectors an a case on them. My son barely dropped his the screen shattered it still came on but wouldnt respond to touch.... He didnt even have it 3 days... my daughters hasnt been cracjed or anything and all of a sudden the screen has quit responding to touch its lasted abiut two weeks.. I do not recommend this brand. But hey you get what you pay for[38]

- *Review by Misael on Oct. 15, 2021*: Until it shattered, it was good. It fell from less than a foot onto a well carpeted floor and cracked to where it's completely unviewable. No other device I own has taken damage from such a drop. It either fell at just the exact angle to shatter into uselessness or it's a matter of quality. until that, it was good enough that I was about to buy them for all my grandkids.[39]

- *Review by Kay on May 20, 2022*: Don't fall for the price point not worth it! Better off just spending extra on a decently made tablet. Just bought this for light use, with a rubber case and screen protector. And either digitizer has messed up or screen has shattered with MINIMAL impact. This has happened 3 times! I've had an iPad for 5 years that I use 9-10hrs a day it has been through it and has no cracks and works perfectly but this thing can't take a 2in drop onto my kitchen table.[40]

- *Review by Krystal on Jun. 24, 2022*: **Cheap and useless** worst tablet ever! Glad i got the 2 year protection plan because the screen cracks from normal use. Cheapest made tablet ever!

---

[36] *Id*.

[37] *Id*.

[38] *onn. 8″ Tablet Pro, 32GB (2020 Model)*, Walmart.com, *available at* https://www.walmart.com/reviews/product/648267237?filter=1 (last accessed July 2, 2022).

[39] *Id*.

[40] *onn. 10.1″ Tablet, 32GB (2020 Model)*, Walmart.com, *available at* https://www.walmart.com/reviews/product/248528865?filter=1 (last accessed July 2, 2022).

Very disappointed. Replacing AGAIN since March 2022 (this will be the 3rd time!) Do not waste your money[41]

- *Review by Unhappymamma0202 on Aug. 27, 2021*: **Hate it overall!** Won't last long enough to matter. We owned two, one stopped charging within 3 months and the other one had a touch screen that stopped responding within 6 months.[42]

- *Review by NoName on Sep. 5, 2021*: **DO NOT BUY, WASTE OF MONEY!** We've had 4 of these tablets all different sizes. They get one crack in the screen and completely stop working. You can't do anything after the screen cracks. Other tablets get cracks and still work. Glad I bought a warranty on my last one.[43]

- *Review by Codi on Mar. 28, 2022*: don't buy this this is the worst tablet ever and such a waste of money I've bought 4 different ones and none of them lasted a week. this one i got in mail today is already broken i put on car and protection screen didn't help i went to pick it up screen shows nothing. but a Crack. not the glass not the screen protector. what happened? don't buy this[44]

- *Review by Notworththemoney on Nov. 1, 2021*: **Touch screen** I bought 4 of these one for each of my kids and one for me and not even a week or two later most of them had either cracked without being dropped or the screen stopped working. Also the battery life lasts only an hour even if you leave it on the charger all night. I would not recommend if you need it for anything major!![45]

- *Review by Jessica on Feb. 16, 2022*: **dont waste your money** dont buy this product we bought 6 of tbese for our kids for xmas and if you barley drop the tablet or bang it on something the screen will break and wal mart or onn wont help fix or replace it if they had a rating for -5 thats how i would rate it dont waste your money very disappointed now have bunch of dispointed kids[46]

---

[41] *onn. 7″ Tablet, 16GB (2021 Model)*, Walmart.com, *available at* https://www.walmart.com/reviews/product/800435260?filter=1 (last accessed July 2, 2022).
[42] *Id*.
[43] *Id*.
[44] *Id*.
[45] *Id*.
[46] *Id*.

- *Review by Matthew on Jan. 5, 2022*: **Needs a better screen** They can't really needs a better screen the screen cracked underneath the screen protector while my son was in a car mind you it was -27 this morning but still the screen should have not broke under the screen protector he was doing nothing but watching his videos looks like when the tablet heated up it ended up cracking the screen[47]

- *Review by Alayna on Jun. 26, 2022*: **Broke in less than a week, crappy quality, cheap.** This tablet lasted LESS than a week! The screen just stopped working with flashing all over. It wasn't dropped, sat on, thrown or hit, there is absolutely no reason the screen would have busted. My husband put the receipt in the box, which I stupidly threw away so we can't even return it when it's been less than a week. A complete waste of money, really crappy video and camera quality, super low volume you can barely hear, it worked for my toddlers first tablet but after this incident I'm appalled at how cheap this item is. Ridiculous![48]

- *Review by Chi134285 on Dec. 26, 2019*: **Don't do it...** I broke the screen trying to rearrange the protective case on the tablet. I bought it for my 2 year old, and for the amount I paid, I didn't expect the greatest quality. Just putting this out there to let you know how cheap and flimsy this thing is. Be very sensitive if you get a protective case.[49]

- *Review by Al on Mar. 28, 2020*: **2 out of 3 tablets don't work after 1 month.** Bought 3 of these a month ago for my kids. 2 of them have stopped working already!!!! The touch screen on one is completely unresponsive, that happened yesterday, and now another one wont even turn on at all...2 tablets down within a day of each other...almost like they're designed to fail. If you do buy one of these, get the protection plan because you're going to need it. [50]

- *Review by Awful on Sep. 24, 2020*: **Don't waste your money or your sanity** This is the worst brand of tablet I've ever purchased. This makes the 3rd one I've had to exchange because the screen has quit working yet again. It's like there's a sensor in the screen

[47] *Id.*
[48] *Id.*
[49] *onn. 7" Tablet 16GB Android*, Walmart.com, *available at* https://www.walmart.com/reviews/product/337319622?filter=1 (*last accessed* July 2, 2022).
[50] *Id.*

that quits working. It's been the same issue with each one we've purchased.[51]

- *Review by NaNa1680 on Jul. 17, 2020*: **Worst tablet everrrrr** The worst tablet ever..well actually u get what u pay for an for $40 I shouldn't have expected much..got it to replace my 8yrs tablet she broke..this tablet takes FOREVER 2 charge which is a nightmare to a kid..once it's dead it DEAD for about 6hrs til it recharges..it loads slowly..I bought it a month ago an it's frozen,an the touch screen is inactive which renders the tablet useless..I want my $40 back..DNT buy this unless u want to waste ur money..only been a month an it's trash[52]

91.     Based on the prevalence of these and similar reviews, Walmart was aware or should have become aware of the Display Defect no later than late 2019, soon after the first negative reviews were posted to its website.

92.     Despite this knowledge, Walmart has failed to disclose and has actively concealed the true nature of the Display Defect from Plaintiffs, Class members and the public. Walmart continues to market and advertise the Class Devices to unsuspecting customers as though they do not possess the Display Defect, repeating false and misleading representations to induce consumers to purchase the tablets.

**E.  Defendant Has Not Remedied the Display Defect**

93.     Thus far, Defendant has not acknowledged the Display Defect, much less attempted to repair or remedy it.

94.     Defendant provides owners of defective Class Devices the option to return their tablets within thirty days for a replacement. But many of those owners who have opted to exchange their Class Devices report that the Display Defect also manifested on their replacement tablets, and sometimes in the replacements for the replacements.

---

[51] *Id*.
[52] *Id*.

95.     Class Device owners who have opted for a replacement are sometimes forced to pay restocking, exchange, and shipping fees. Additionally, owners of defective Class Devices have spent countless hours interacting with Defendant's customer service agents, dealing with the replacement or repair processes, and setting up replacement tablets, among other things.

96.     As explained in more detail below, Defendant explicitly excludes display damage from the warranty. Thus, Class Device purchasers are unable to send their tablets in for replacement or repair after the thirty-day return period. Defendant also refuses to provide refunds to owners of defective Class Devices outside of the thirty-day return period. This is an abusive business practice in light of the fact that Defendant has not taken any steps to inform the public at large that the Class Devices are impacted by the Display Defect, nor has it been forthright with owners of the Class Devices about the nature of the Display Defect. Moreover, many owners of defective Class Devices have found themselves unable to secure a repair or replacement within the one-year warranty period due to Defendant's unresponsive and hostile customer service. This is also an abusive business practice.

97.     Despite not being able to offer a failsafe solution to the Display Defect, Walmart still does not offer owners of defective Class Devices the option of a full refund outside the return period.

98.     Walmart has made no effort to communicate to the public at large that the Class Devices are defective.

99.     Defendant has caused injury to a sizable number of owners of Class Devices and continues to misleadingly market the Class Devices as high-quality, versatile, and dependable tablet computers.

100.     Plaintiffs have also provided Defendant with notice of the Display Defect. Prior to filing this suit, Plaintiffs, through counsel, sent letters (the "Notice Letters") to Defendant's registered agents in California and Massachusetts by certified mail, which were received on August 30, 2024, and September 4, 2024, respectively. The Notice Letters identified Plaintiffs Hansbrough and Kirchner, described the unfair and deceptive acts or practices alleged herein, and provided a framework for settlement. Defendant did not provide any written tender of settlement in response to the Notice Letters.

## CLASS ALLEGATIONS

101.     Plaintiffs bring this lawsuit on behalf of themselves and all similarly situated individuals and entities in California and Massachusetts, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

102.     Plaintiffs' proposed California and Massachusetts Classes (referred to together as the "Classes") are defined as follows:

> **Massachusetts Class**. All persons in Massachusetts who purchased a Class Device.
>
> **California Class.** All persons in California who purchased a Class Device.

103.     Excluded from the Classes are Defendant, its affiliates, and its current and former employees, officers, and directors. Plaintiffs reserve the right to modify, change, or expand the definitions of the Classes based upon discovery and further investigation.

104.     *Numerosity*: The Classes are so numerous that joiner of all members is impracticable. At least thousands of the Classes members have been subjected to Defendant's conduct. The Classes are ascertainable by reference to records in the possession of Walmart and its retail locations.

105.    *Predominance*: Common questions of law and fact exist as to all members of the Classes. These questions predominate over questions affecting individual members of the Classes and include:

a)    Whether the Class Devices possess a design defect;

c)    Whether the Class Devices were defective at the point of sale;

d)    Whether the Display Defect substantially reduces the value of the Class Devices;

e)    Whether Defendant knew of the Display Defect but failed to disclose it to consumers;

f)    Whether and when Defendant knew that the Class Devices' displays are especially prone to cracking and malfunctioning during normal and expected use conditions, rendering them functionally unusable;

g)    Whether a reasonable consumer would consider the Display Defect to be material;

h)    Whether Defendant's conduct was unlawful;

i)    Whether Defendant acted negligently, recklessly, and/or with intent to deceive;

j)    Whether Plaintiffs and members of the Classes overpaid for their Class Devices as a result of the Display Defect;

k)    Whether Plaintiffs and members of the Classes are entitled to damages and other monetary relief, and, if so, in what amount; and

l)    Whether Plaintiffs and members of the Classes are entitled to equitable relief, including restitution or injunctive relief.

106.    *Typicality*: Plaintiffs' claims are typical of the claims of the members of the Classes, as all such claims arise out of Defendant's conduct in marketing, advertising, and selling the Class Devices. All of Plaintiffs' claims are typical of the claims of the Classes since Plaintiffs and all

members of the Classes were injured in the same manner by Defendant's uniform course of conduct described herein. Plaintiffs and members of the Classes have the same claims against Defendant relating to the conduct alleged herein, and the same events giving rise to Plaintiff's claims for relief are identical to those giving rise to the claims of all members of the Classes. Plaintiffs and all members of the Classes sustained economic injuries including, but not limited to, ascertainable losses arising out of Defendant's course of conduct as described herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent members of the Classes.

107.    *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have no interests antagonistic to those of the Classes. Plaintiffs have retained counsel experienced in the prosecution of complex class actions including, but not limited to, consumer class actions involving, *inter alia*, breach of warranties, product liability, product design defects, and state consumer fraud statutes.

108.    *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable, and the amount at issue for each member of the Classes would not justify the cost of litigating individual claims. Should individual members of the Classes be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

109.   *Manageability*: Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

110.   The statutes of limitations for any claims that Plaintiffs bring or could bring against Walmart are tolled as a result of Walmart's fraudulent concealment and unlawful acts. Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims asserted herein until the Display Defect surfaced in Plaintiffs' Class Devices.

111.   As set forth above, Walmart acted unfairly, fraudulently, and deceptively in concealing the Display Defect from Plaintiffs and other consumers by making false representations about the superior quality of the Class Devices' displays, as set forth above, to entice consumers to buy the Display Defective Class Devices. In addition, as alleged herein, Walmart was aware of numerous consumer complaints about the Display Defects in the Class Devices, but never disclosed the Display Defects to Plaintiffs and the Classes, and instead, continued making false representations and misleading consumers about the performance and quality of the Class Devices and selling the Class Devices, despite their defective designs.

112.   At the time of the purchase of their Class Devices, Plaintiffs were unaware of any public information offered by Defendant that would have put them on notice that the Class Devices were defective. Plaintiffs understandably and reasonably relied on the representations that Walmart made about the Class Devices as having a high-quality display and being versatile and durable, as set forth herein. Plaintiffs became aware of the latent and unobservable Display Defect only after it impacted their Class Devices. Plaintiffs were not at fault for failing to discover the Display Defective design in the Class Devices as the source of the display issues.

113.    Had Plaintiffs and members of the Classes known that the Class Devices were defective, they would not have purchased the Class Devices, would not have purchased them at the prices they did, or would have returned them during their respective return periods.

114.    Walmart had a duty to publicly disclose the Display Defect because, through its advertisements and promotional materials, it represented to Plaintiffs and members of the Classes that, among other things, the Class Devices had high quality displays and were versatile and dependable. Walmart failed to disclose facts that would have materially qualified these representations, including that the display and case are made of inappropriate materials and that the case suffers from a design defect that makes the display susceptible to breaking, suffering display issues, and complete display failure. Walmart had a duty to disclose the truth about the Display Defective design, and that the display screens were not of high quality, as Walmart represented. Walmart concealed these defects from Plaintiffs and members of the Classes.

### FIRST CAUSE OF ACTION

**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**(On behalf of the California Class)**

115.    Plaintiff Hansbrough incorporates by reference each of the above paragraphs, as though fully set forth herein.

116.    Plaintiff Hansbrough brings this Count individually and on behalf of the California Class under the California Consumer Legal Remedies Act ("CLRA"). Cal. Civ. Code § 1750, *et seq*.

117.    Plaintiff Hansbrough and California Class members are "consumers" as defined in Cal. Civ. Code § 1761(d).

118.    Defendant is a "person" as defined in Cal. Civ. Code § 1761(c).

119.    The Class Devices are "goods" as defined in Cal Civ. Code § 1761(a).

120.    Defendant's conduct, as described herein, was and is in violation of the CLRA. Defendant's conduct violates at least the following enumerated CLRA provisions:

a.    § 1770(a)(4): Using deceptive representations in connection with goods;

b.    § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

c.    § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another; and

d.    § 1770(a)(9): Advertising goods with intent not to sell them as advertised.

121.    Specifically, Defendant violated the CLRA by:

a.    representing through advertisements and product packaging that the Class Devices were of a particular standard or quality that it knew or should have known were of another;

b.    representing through advertisements and product packaging that the Class Devices have characteristics, uses, and benefits that they do not have;

c.    using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact—such as the existence of the Display Defect—in a manner that deceives or tends to deceive purchasers of Class Devices, and while knowing that consumers would rely on the advertisements and Defendant's uniform representations concerning the Class Devices' display quality and functionality in purchasing their Class Devices;

d.    taking advantage of the lack of knowledge, ability, experience or capacity of purchasers of Class Devices to evaluate the quality of the Class Devices to a grossly unfair degree; and

e.    selling defective Class Devices, resulting in a gross disparity between the value received by purchasers and the price paid.

122.    Such pattern of conduct was uniform in nature with respect to the marketing and sale of each of the Class Devices.

123.    Defendant's representations and omissions were material because they were likely to and in did in fact deceive reasonable consumers about the quality, characteristics, and usefulness of the Class Devices.

124.    Defendant knew or should have known that the Class Devices suffered from the Display Defect, i.e., that their displays are susceptible to cracking and malfunctioning during the course of normal usage.

125.    The aforesaid conduct constitutes unfair competition and unfair or deceptive acts or practices in violation of the CLRA. Cal. Civ. Code § 1770.

126.    The Notice Letter provided by Plaintiff Hansbrough to Defendant prior to this suit satisfies the CLRA's requirement to provide a written demand for relief prior to bringing a lawsuit under the CLRA. Cal. Civ. Code § 1782(a).

127.    Defendant's violations have caused financial injury to Plaintiff Hansbrough and the other California Class members, each of whom purchased a Class Device that did not conform to Defendant's representations and was worth less than the price paid. Such injury was directly caused by Defendant's unlawful conduct detailed herein. Had Plaintiff Hansbrough and the other Class Members known of the Display Defect, they would not have purchased the Class Devices or would have paid less for them.

128.    As a direct and proximate result of Defendant's violation of the CLRA, Plaintiff Hansbrough and California Class members are entitled under Cal. Civ. Code § 1780 to recover

actual damages, statutory damages, punitive damages, an order enjoining the unlawful practice, reasonable attorney's fees, and such other further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (On Behalf of the California Class)

129.    Plaintiff Hansbrough fully incorporates by reference each of the above paragraphs, as though fully set forth herein.

130.    Plaintiff Hansbrough brings this Count individually and on behalf of the California Class under the California Unfair Competition Law ("UCL"). Cal. Bus. & Prof. Code § 17200 *et seq.*

131.    Plaintiff, California Class members, and Defendant are "persons" engaged in trade or commerce as defined by the UCL. Cal. Bus. & Prof. Code § 17201.

132.    As alleged herein, Defendant engaged in unfair competition, including unlawful, unfair, or fraudulent business acts or practices, in violation of the UCL, including but not limited to:

    a.  representing through advertisements and product packaging that the Class Devices were of a particular standard or quality that it knew or should have known were of another;

    b.  representing through advertisements and product packaging that the Class Devices have characteristics, uses, and benefits that they do not have;

    c.  using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact—such as the existence of the Display Defect—in a manner that deceives or tends to deceive purchasers of Class Devices, and while knowing that consumers would rely on the advertisements and Defendant's uniform

representations concerning the Class Devices' display quality and functionality in purchasing their Class Devices;

d.  taking advantage of the lack of knowledge, ability, experience or capacity of purchasers of Class Devices to evaluate the quality of the Class Devices to a grossly unfair degree; and

e.  selling defective Class Devices, resulting in a gross disparity between the value received by purchasers and the price paid.

133.  Such pattern of conduct was uniform in nature with respect to the marketing and sale of each of the Class Devices.

134.  Defendant's representations and omissions were material because they were likely to and in did in fact deceive reasonable consumers about the quality, characteristics, and usefulness of the Class Devices.

135.  Defendant knew or should have known that the Class Devices suffered from the Display Defect, i.e., that their displays are susceptible to cracking and malfunctioning during the course of normal usage.

136.  The aforesaid conduct constitutes unfair competition in violation of the UCL. Cal. Bus. & Prof. Code § 17203.

137.  Defendant's violations have caused financial injury to Plaintiff Hansbrough and the other California Class members, each of whom purchased a Class Device that did not conform to Defendant's representations and was worth less than the price paid. Such injury was directly caused by Defendant's unlawful conduct detailed herein. Had Plaintiff Hansbrough and the other California Class members known of the Display Defect, they would not have purchased the Class Devices or would have paid less for them.

138.    The Defendant's violations of the UCL have an impact of great or general importance on the public.

139.    As a direct and proximate result of Defendant's violation of the UCL, Plaintiff Hansbrough and California Class members are entitled to a judgment under Cal. Bus. & Prof. Code § 17203 to enjoin further violations, to recover relief necessary to restore their interest in money and property acquired by means of Defendant's unfair competition, and such other further relief as the Court deems just and proper.

<u>**THIRD CAUSE OF ACTION**</u>

**BREACH OF EXPRESS WARRANTY UNDER THE SONG-BEVERLY CONSUMER WARRANTY ACT**
**(On behalf of the California Class)**

140.    Plaintiff Hansbrough fully incorporates by reference the above paragraphs, as though fully set forth herein.

141.    The Class Devices are "consumer goods" under Cal. Civ. Code § 1791(a).

142.    Plaintiff Hansbrough and California Class members are "buyers" under Cal. Civ. Code § 1791(b).

143.    Defendant is and was at all relevant times a "manufacturer" and seller of the class Devices under Cal. Civ. Code § 1791(j).

144.    Defendant expressly warranted the Class Devices against defects including the Display Defect within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, including by disclaiming on Class Device packaging that the Class Devices were covered by a "2 Year Warranty."

145.    However, the Class Devices are defective due to the Display Defect. The Display Defect substantially impairs the use, value, reliability, and performance of the Class Devices to reasonable consumers, including Plaintiff Hansbrough and California Class members.

146.    Defendant knew of the Display Defect when it expressly warranted the Class Devices, wrongfully and fraudulently concealed material facts regarding the Display Defect, failed to inform California Class members that the Class Devices were defective, and induced Plaintiff Hansbrough and California Class members to purchase the Class Devices under false or fraudulent pretenses.

147.    Defendant is obligated, under the terms of its express warranties, and pursuant to Cal. Civ. Code § 1793.2, to repair or replace the defective components in the Class Devices at no cost to Plaintiff Hansbrough and California Class members.

148.    Defendant breached its express warranties by supplying the Class Devices to Plaintiff Hansbrough and California Class members with the Display Defect, by failing to repair Class Devices under warranty, and by failing to provide to Plaintiff Hansbrough or the California Class members, as a warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Devices to Plaintiff Hansbrough and Class Members.

149.    Defendant was provided with appropriate notice and has been on notice of the Display Defect and its breach of express written warranties from various sources, including Plaintiff Hansbrough.

150.    Affording Defendant any further opportunity to cure its breach of written warranties is unnecessary and would be futile.

151.    Any express warranties promise to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Plaintiff Hansbrough and California Class members whole and because Defendant has failed or has refused to adequately provide the promised remedies within a reasonable time.

152.    Accordingly, recovery by Plaintiff Hansbrough and California Class members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

153.    Any attempt by Defendant to limit or disclaim the express warranties in a manner that would exclude coverage of the Display Defect is unenforceable and void pursuant to Cal. Civ. Code § 1790.1.

154.    As a direct and proximate result of Defendant's breach of its express warranties, Plaintiff Hansbrough and California Class members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

155.    Pursuant to Cal. Civ. Code §§ 1794 and 1795.4, Plaintiff Hansbrough and California Class members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

## FOURTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY UNDER THE SONG-BEVERLY CONSUMER WARRANTY ACT
### (On behalf of the California Class)

156.    Plaintiff Hansbrough fully incorporates by reference the above paragraphs, as though fully set forth herein.

157.    The Class Devices are "consumer goods" under Cal. Civ. Code § 1791(a).

158.    Plaintiff and Hansbrough and California Class members are "buyers" under Cal. Civ. Code § 1791(b).

159.    Defendant is and was at all relevant times a "manufacturer" and seller of the class Devices under Cal. Civ. Code § 1791(j).

160.    Defendant impliedly warranted the Class Devices against defects including the Display Defect within the meaning of Cal. Civ. Code §§ 1792.

161.    However, the Class Devices are defective due to the Display Defect. The Display Defect substantially impairs the use, value, reliability, and performance of the Class Devices to reasonable consumers, including Plaintiff Hansbrough and California Class members.

162.    Defendant knew of the Display Defect when it impliedly warranted the Class Devices, wrongfully and fraudulently concealed material facts regarding the Display Defect, failed to inform California Class members that the Class Devices were defective, and induced Plaintiff Hansbrough and California Class members to purchase the Class Devices under false or fraudulent pretenses.

163.    The Display Defect has deprived Plaintiff Hansbrough and California Class members of the benefit of their bargain and reduced the value of the Class Devices.

164.    Defendant was provided with appropriate notice and has been on notice of the Display Defect and its breach of express implied warranties from various sources, including Plaintiff Hansbrough.

165.    Affording Defendant any further opportunity to cure its breach of implied warranties is unnecessary and would be futile.

166.    Any attempt by Defendant to limit or disclaim the implied warranties in a manner that would exclude coverage of the Display Defect is unenforceable and void pursuant to Cal. Civ. Code § 1790.1.

167.    As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiff Hansbrough and California Class members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

168.    Pursuant to Cal. Civ. Code §§ 1794 and 1795.4, Plaintiff Hansbrough and California Class members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

## FIFTH CAUSE OF ACTION

### VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION LAW
#### (On behalf of the Massachusetts Class)

169.    Plaintiff Kirchner fully incorporates by reference the above paragraphs, as though fully set forth herein.

170.    Plaintiff Kirchner brings this Count individually and on behalf of the Massachusetts Class under the Massachusetts Consumer Protection Law ("Chapter 93A"). Mass. Gen. L. Ch. 93A, *et seq.*

171.    Plaintiff Kirchner, Massachusetts Class members, and Defendant each qualify as a "person" engaged in "trade or commerce" as defined in Chapter 93A. Mass. Gen. L. Ch. 93A, § 1(a)-(b).

172.    As alleged herein, Defendant engaged in "unfair or deceptive acts or practices" in the conduct of trade and commerce in violation of Chapter 93A, including but not limited to:

a.   representing through advertisements and product packaging that the Class Devices were of a particular standard or quality that it knew or should have known were of another;

b.   representing through advertisements and product packaging that the Class Devices have characteristics, uses, and benefits that they do not have;

c.   using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact—such as the existence of the Display Defect—in a manner that deceives or tends to deceive purchasers of Class Devices, and while knowing that

44

consumers would rely on the advertisements and Defendant's uniform representations concerning the Class Devices' display quality and functionality in purchasing their Class Devices;

d.  taking advantage of the lack of knowledge, ability, experience or capacity of purchasers of Class Devices to evaluate the quality of the Class Devices to a grossly unfair degree; and

e.  selling defective Class Devices, resulting in a gross disparity between the value received by purchasers and the price paid.

173.   Defendant's pattern of conduct was uniform in nature with respect to the marketing and sale of each of the Class Devices.

174.   Defendant's representations and omissions were material because they were likely to and did deceive reasonable consumers about the quality, characteristics, and usefulness of the Class Devices.

175.   Defendant's violations of Chapter 93A were knowing and willful. Defendant knew or should have known that the Class Devices suffered from the Display Defect—i.e., that their displays are susceptive to cracking and malfunctioning during the course of normal usage.

176.   Defendant's violations of Chapter 93A caused financial injury to Plaintiff Kirchner and the Massachusetts Class, each of whom purchased a Class Device that did not conform to Defendant's express or implied representations and was thus worth less than the price paid.

177.   Injuries to Plaintiff Kirchner and Massachusetts Class members were directly caused by Defendant's unlawful conduct detailed herein. Had Plaintiff Kirchner and Massachusetts Class members known of the Display Defect, they would not have purchased the Class Devices or would have paid less for them.

178.     The Notice Letter provided by Plaintiff Kirchner to Defendant prior to this suit satisfies Mass. Gen. L. Ch. 93A § 9(3) requirement to provide a written demand for relief prior to bringing a lawsuit under Chapter 93A.

179.     Pursuant to Chapter 93A, Plaintiff Kirchner and Massachusetts Class Members are entitled to recover "actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation[.]" Mass. Gen. L. Ch. 93A, § 9(3).

180.     Pursuant to Chapter 93A, Plaintiff Kirchner and Massachusetts Class Members are entitled to recover reasonable attorney's fees and costs incurred in bringing this action. Mass. Gen. L. Ch. 93A, § 9(4).

181.     Pursuant to Chapter 93A, Plaintiff Kirchner and Massachusetts Class Members are entitled to recover equitable relief, including an injunction, as the Court deems necessary and proper. Mass. Gen. L. Ch. 93A § 9(3).

### SIXTH CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY
**(On behalf of the California and Massachusetts Classes)**

182.     Plaintiffs fully incorporate by reference the above paragraphs, as though fully set forth herein.

183.     Plaintiffs brings this Count individually and on behalf of the California and Massachusetts Classes under the California Uniform Commercial Code and Massachusetts Uniform Commercial Code. Cal. Com. Code § 2101, *et seq.*; Mass. Gen. L. Ch. 106, *et seq.*

184.     The Class Devices are and were at all relevant times "goods" as defined by Cal. Com. Code § 2105(1) and Mass. Gen. L. Ch. 106, Art. 2, § 2-105(1).

185.    Defendant is and was at all relevant times a "merchant" with respect to the Class Devices as defined by Cal. Com. Code § 2104(1) and Mass. Gen. L. Ch. 106, Art. 2, § 2-104(1).

186.    Plaintiff Hansbrough and California Class members are and were at all relevant times "buyers" as defined by Cal. Com. Code § 2103(1)(a).

187.    Plaintiff Kirchner and Massachusetts Class members are and were at all relevant times "buyers" as defined by Mass. Gen. L. Ch. 106, Art. 2, § 2-103(a).

188.    Plaintiffs and California and Massachusetts Class Members bought Class Devices designed, manufactured, warranted, and marketed to them by Defendant.

189.    Defendant created "express warranties" as to the Class Devices against defects, including the Display Defect within the meaning of Cal. Com. Code § 2313(1) and Mass. Gen. L. Ch. 106, Art. 2, § 2-313.

190.    Defendant's created express warranties by describing the Class Devices on their packaging as durable and suitable for children, which included representations on product packaging that the Class Devices were a "Kids' Tablet" designed "just for them" and "made [to be] more kid-centric," had a "scratch-resistant touchscreen," came with a protective "[s]ilicone case," and were covered by a "2 Year Warranty."

191.    But as described above, the display in the Class Devices is defective and breaches this express warranty. As a result of this breach of express warranty, Plaintiffs and California and Massachusetts Class members were injured by buying and accepting Class Devices whose value, use, and performance are substantially impaired below what Defendant expressly warranted.

192.    As detailed above, Defendant has been provided with appropriate notice and has been on notice of the Display Defect and its breach of express warranty from various sources, including Plaintiffs.

193.    Plaintiffs have provided Walmart with a reasonable opportunity to cure its breach of express warranties and Walmart has failed to do so.

194.    Affording Walmart any further opportunity to cure its breach of express warranty would be futile.

195.    Due to Walmart's breach of express warranties, Plaintiffs and California and Massachusetts Class members are entitled to recover as damages the difference between the value of the Class Devices with the Display Defect and the value they would have had had the Class Devices not been plagued with the Display Defect as expressly warranted by Walmart.

<u>**SEVENTH CAUSE OF ACTION**</u>

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(On behalf of the California and Massachusetts Classes)**

196.    Plaintiffs fully incorporate by reference the above paragraphs, as though fully set forth herein.

197.    Plaintiffs bring this Count individually and on behalf of the California and Massachusetts Class under the California Uniform Commercial Code and Massachusetts Uniform Commercial Code. Cal. Com. Code § 2101, *et seq.*; Mass. Gen. L. Ch. 106, *et seq.*

198.    The Class Devices are and were at all relevant times "goods" as defined by Cal. Com. Code § 2105(1) and Mass. Gen. L. Ch. 106, Art. 2, § 2-105(1).

199.    Defendant is and was at all relevant times a "merchant" with respect to the Class Devices as defined by Cal. Com. Code § 2104(1) and Mass. Gen. L. Ch. 106, Art. 2, § 2-104(1).

200.    Plaintiff Hansbrough and California Class members are and were at all relevant times "buyers" as defined by Cal. Com. Code § 2103(1)(a).

201.    Plaintiff Kirchner and Massachusetts Class members are and were at all relevant times "buyers" as defined by Mass. Gen. L. Ch. 106, Art. 2, § 2-103(a).

202.    Plaintiffs and California and Massachusetts Class Members bought Class Devices designed, manufactured, warranted, and marketed to them by Defendant.

203.    Defendant's sale of the Class Devices came with "implied warranties" against defects, including the Display Defect, within the meaning of Cal. Com. Code § 2314 and Mass. Gen. L. Ch. 106, Art. 2, § 2-314, 315.

204.    But as described above, the display in the Class Devices is defective and breaches these implied warranties. As a result of this breach of implied warranty, Plaintiffs and California and Massachusetts Class members were injured by buying and accepting Class Devices whose value, use, and performance are substantially impaired below what Defendant expressly warranted.

205.    As detailed above, Defendant has been provided with appropriate notice and has been on notice of the Display Defect and its breach of implied warranties from various sources, including Plaintiff.

206.    Plaintiffs have provided Walmart with a reasonable opportunity to cure its breach of implied warranties and Walmart has failed to do so.

207.    Affording Walmart any further opportunity to cure its breach of implied warranties would be futile.

208.    Due to Walmart's breach of implied warranties, Plaintiffs and California and Massachusetts Class members are entitled to recover as damages the difference between the value of the Class Devices with the Display Defect and the value they would have had had the Class Devices not been plagued with the Display Defect as expressly warranted by Walmart.

### EIGHTH CAUSE OF ACTION

**UNJUST ENRICHMENT**
**(On behalf of the California and Massachusetts Classes)**

209.    Plaintiffs fully incorporates by reference the above paragraphs, as though fully set forth herein.

210.    Plaintiffs brings this Count individually and on behalf of the Classes under California and Massachusetts common law.

211.    Defendant has been unjustly enriched by Plaintiffs and members of the Classes who purchased Class Devices from Defendant and purchased replacements and services from Defendant that Plaintiffs and members of the Classes would not have purchased but for Walmart's misconduct alleged above with respect to the Display Defect.

212.    Plaintiffs and members of the Classes unknowingly conferred a benefit on Defendant of which Defendant had knowledge, since Defendant was aware of the Display Defect but failed to disclose this knowledge and misled Plaintiffs and members of the Classes regarding the nature and quality of the Class Devices while profiting from this deception.

213.    The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Defendant to retain the benefit of money that it unfairly obtained from Plaintiffs and members of the Classes.

214.    As a result of this unjust enrichment Plaintiffs and members of the Classes are entitled to damages, which include the price they paid for the Class Devices and the cost of any services, replacements, and warranty-related expenditures Plaintiff and members of the Classes expended to temporarily remedy the Display Defect.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request of this Court the following relief, on behalf of themselves and the proposed Classes:

a.  an order certifying the proposed California and Massachusetts Classes, designating Plaintiffs as named representative of the respective Classes, and designating the undersigned as Class Counsel;

b.  a declaration that the displays in the Class Devices are defective;

c.  a declaration that Defendant is financially responsible for notifying all members of the Classes about the Display Defect in the Class Devices;

d.  an order enjoining Defendant from further unfair and deceptive trade practices with respect to the Class Devices, and to permanently repair the Class Devices so that they no longer possess the Display Defect;

e.  an award to Plaintiffs and members of the Classes of damages, including actual damages, statutory damages, and/or treble damages, in an amount to be proven at trial;

f.  a declaration that Defendant must disgorge, for the benefit of Plaintiffs and members of the Classes, all or part of the ill-gotten profits it received from the sale of the Class Devices, or make full restitution to Plaintiffs and members of the Classes;

g.  an award of attorneys' fees and costs as allowed by law;

h.  an award of pre-judgment and post-judgment interest;

i.  leave to amend this Complaint to conform to the evidence produced at trial; and

j.  such other and further relief as the Court may deem appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury of any and all issues in this action so triable as of right.

Dated: October 9, 2024

Respectfully submitted,

/s/ Randall K. Pulliam
Allen Carney (ABN 94122)
Randall K. Pulliam (ABN 98105)
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: 501-312-8500
Email: acarney@cbplaw.com
Email: rpulliam@cbplaw.com

Jason S. Rathod*
MIGLIACCIO & RATHOD LLP
412 H St NE, Suite 302
Washington D.C. 20002
Telephone: (202) 470-3520
Facsimile: (202) 800-2730
Email: jrathod@classlawdc.com

*Attorneys for Plaintiffs*

*\* Pro hac vice forthcoming*